**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ABC Sand and Rock Company, Inc.; and David Waltemath,<br><br>Plaintiffs,<br><br>v.<br><br>Maricopa County; Flood Control District of Maricopa County; William Wiley; Ed Raleigh; Anthony Beuche; Michael Fulton; Scott Vogel; and Jane Doe Spouses,<br><br>Defendants. | No. CV-21-01875-PHX-DGC<br><br>**ORDER** |

Defendants have filed a motion for summary judgment. Doc. 43. The motion is fully briefed and the Court heard oral argument on August 7, 2023. *See* Doc. 54. For reasons stated below, the Court will grant the motion.

**I.     Background.**

This case is the latest in a longstanding dispute between ABC Sand and Rock Company ("ABC") and its owner, David Waltemath (collectively, "Plaintiffs"), and the Flood Control District of Maricopa County (the "District"). ABC operates a sand and gravel mine in the floodplain at the confluence of the New River and the Agua Fria River in Maricopa County, Arizona. The District regulates and issues five-year permits for mining operations in floodplains. *See* A.R.S. §§ 48-3609(B)(1), 48-3613(A); Floodplain Regulations for Maricopa County §§ 401-04.

1

ABC mined under permits issued by the District from 1985 to 2011. ABC applied to renew its permit in 2011. Disputes over this renewal and subsequent developments led to extensive litigation between the parties for the last decade. ABC and the District have engaged in adversary proceedings before a District hearing officer several times, on appeal to the District Board at least twice, in Maricopa County Superior Court at least three times, before the Arizona Court of Appeals three times, and in this Court at least two times before this case. *See ABC Sand & Rock Co., Inc. v. Maricopa Cnty.*, No. CV-17-01094-PHX-DGC, 2021 WL 3491947, at *1-8 (D. Ariz. Aug. 9, 2021) (discussing history of litigation between the parties). ABC has previously asserted five state law claims, four federal law claims, and injunctive and declaratory relief claims against the District. *Id.* at *3. This Court has previously granted summary judgment on ABC's § 1983 claims based on free speech, due process, and equal protection, as well as a § 1985 claim for conspiracy. *Id.* at *4-13.

Despite this ongoing litigation, ABC submitted a proposed plan of development to the District and applied for a new permit in 2015. Doc. 44 ¶¶ 3, 14. ABC's previous permit allowed it to mine to a depth of 10 feet in the floodplain and up to 40 feet in the floodplain fringe, but the 2015 application sought authorization to mine to a depth of 60 feet. *Id.*; Doc. 46-3 at 3. The District reviewed the proposed plan of development and issued multiple requests for corrections, to which ABC responded. Doc. 44 ¶¶ 5, 15-16; Doc. 44-4. ABC's engineer, Pedro Calza, completed and sealed the plan in July 2017. Docs. 44 ¶ 3, 44-2. The District approved the plan and issued ABC a new permit on August 10, 2017 (the "Permit"). Docs. 44 ¶ 24, 44-14.

Arizona law requires flood control districts to regulate floodplains, which are areas in a watercourse that may be covered partially or wholly by water from a 100-year flood. *See* A.R.S. § 48-3601(6); *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cnty.*, 217 P.3d 1220, 1238 (Ariz. Ct. App. 2009). Because of concern that a 100-year flood of the New River could enter ABC's mining pit with a flow rate of 39,000 cubic feet per second ("cfs"), the Permit stipulated that ABC must stabilize the site, and established time

limits for ABC to do so. Docs. 22 ¶¶ 40-41, 44-14 at 4-6. The stabilization requirements include substantial excavation of the site and installation of armor on various slopes and berms. *Id.* ABC may mine to a depth of 60 feet once this work is completed. Doc. 44-14 at 5.

The 39,000 cfs flow rate underlying the Permit's stabilization requirements was based on a New River hydrology study conducted by the United States Army Corps of Engineers in 1982. Docs. 44 ¶¶ 9-10, 44-6. The Federal Emergency Management Agency ("FEMA") adopted that flow rate for purposes of its flood insurance rate map. Doc. 44 ¶ 11. For Maricopa County residents to remain eligible for flood insurance under FEMA's national flood insurance program, the District must regulate floodplains in accordance with FEMA-established flow rates. *Id.* ¶ 4; *see* Docs. 13 at 2-3, 43 at 5 (citing 42 U.S.C. §§ 4012(c), 4022(a)(1), 4102(c)).

In early 2017, ABC requested that a new hydrology study be made of the New River and submitted to FEMA. In response, the District commissioned Cardno Engineering Corporation to conduct the study and prepare a report of its findings. Docs. 46 ¶¶ 33-35, 46-37. The Cardno report was completed in September 2018 and concluded that the 100-year flow rate for the New River is 34,200 cfs. Docs. 44 ¶ 25, 46-37 at 38. At this flow rate, the Permit's stabilization requirements would not change.

Plaintiffs assert that the Permit is based on outdated flow rate data for the New River. Doc. 22 ¶ 66. Plaintiffs argue that the District has refused to review a report Plaintiffs obtained from their own consulting hydrologist, Patricia Dillon, on March 23, 2021. *Id.* ¶¶ 58, 66; *see* Doc. 46-42. Dillon analyzed data from streamflow gages between the outlet of the New River and its confluence with the Agua Fria River. Doc. 46-42 at 2. She opined that the flow rate for any 100-year flood would be no higher than 18,950 cfs. Doc. 46-42 at 11, 13.[1]

---

[1] Plaintiffs state in their papers that Dillon found a flow rate no higher 19,600 cfs (Doc. 22 ¶ 65), but that number does not appear in her report. *See* Doc. 46-42; *see also* Doc. 24 ¶ 65.

3

Plaintiffs claim that complying with the Permit's unnecessary stabilization demands has cost ABC more than $8 million, and that the stabilization requirements are not necessary under Dillon's lower flow rate. Docs. 22 ¶ 45, 45 at 3. Plaintiffs allege that the District chose to rely on an outdated flow rate because it would require improvements on ABC's property that would benefit the District's plan for a recreational corridor – the Agua Fria Watercourse Master Plan. Doc. 22 ¶¶ 52-57, 66-67. Plaintiffs allege that none of the Permit's requirements would actually protect the surrounding areas from any reasonably expected 100-year flood, and instead would simply benefit the District by allowing it to implement the Watercourse Master Plan at a lower cost. *Id.* ¶¶ 42-43, 57, 67.

Plaintiffs sue under 42 U.S.C. § 1983, alleging violations of the Fifth Amendment's Takings Clause (count one) and Due Process Clause (count two). Doc. 22 ¶¶ 15, 18, 101-24. Defendants moved to dismiss Plaintiffs' original complaint (Doc. 1), arguing that it failed to state a plausible claim for relief and was barred by the statute of limitations and claim preclusion. Doc. 13. The Court granted the motion with respect to the individual Defendants but denied it all other respects. Doc. 18. Defendants now move for summary judgment on the claims asserted in the amended complaint. Doc. 43.

**II.    Summary Judgment Standard.**

Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986), and draw justifiable inferences in that party's favor, *Anderson*, 477 U.S. at 255.

### III.     Takings Claim (Count One).

The Takings Clause of the Fifth Amendment, which applies to the States through the Fourteenth Amendment, provides that the government may not take private property for public use without just compensation. U.S. Const. amend. V. The paradigmatic taking is a direct government annexation of private property through eminent domain. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005); *see Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (the government's physical appropriation of private property constitutes "the clearest sort of taking" and is assessed "using a simple, per se rule: [t]he government must pay for what it takes"). Contrary to the assertion in their response (Doc. 45 at 11-12), Plaintiffs do not allege, and have not otherwise shown, a paradigmatic taking in this case. The Permit requires ABC to spend money excavating and armoring the mining site, but it does not annex or appropriate ABC's property.

The Supreme Court has recognized four other kinds of takings: (1) a permanent physical invasion of property, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); (2) a regulation that deprives a plaintiff of all economically beneficial use of property, *see Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992); (3) a general regulatory taking challenge under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978); and (4) a land-use regulation violating the standards set forth in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994). *Lingle*, 544 U.S. at 548; *see also Akshar Glob. Invs. Corp. v. City of L.A.*, 817 F. App'x 301, 304 (9th Cir. 2020); *Beck v. City of Whitefish*, No. CV 22-44-M-KLD, 2023 WL 1068239, at *4 (D. Mont. Jan. 27, 2023). Plaintiffs have not shown a physical invasion of property by the District (a *Loretto* claim), nor do they contend that complying with the Permit's stabilization requirements has deprived ABC of all economically beneficial use of the mining site (a *Lucas* claim). *See* Docs. 43 at 11-14, 45 at 12-17; *Valles v. Pima Cnty.*, 776 F. Supp. 2d 995, 1003 (D. Ariz. 2011) ("If a . . . taking

is at issue in this case, it does not arise under *Loretto* or *Lucas*, because there is no evidence that Pima County has permanently invaded Plaintiffs' property or that Plaintiffs have been deprived of all economically beneficial use of their property.").

If this is a taking, it is a regulatory taking, and most regulatory takings are governed by *Penn Central*. In that case, the City of New York refused to approve plans to construct an office building over Grand Central Terminal due to its designation as a historic site under the City's landmark preservation law. 438 U.S. at 116-17. The Supreme Court acknowledged that it was unable to develop any set formula for evaluating regulatory taking claims, but identified relevant factors to be considered such as the economic impact of the regulation on the plaintiff, the extent to which the regulation has interfered with investment-backed expectations, and the character of the governmental action. *Id.*; *see also Lingle*, 544 U.S. at 538-39.

A different kind of regulatory taking was identified in *Nollan* and *Dolan*. These cases "involved Fifth Amendment takings challenges to adjudicative land-use exactions – specifically, government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." *Lingle*, 544 U.S. at 546 (citations omitted). The Court in *Nollan* determined that a permit could be conditioned on the granting of an easement only if the easement had an "essential nexus" to the government interest that would furnish a valid ground for denial of the permit. 483 U.S. at 837. The Court added to this requirement in *Dolan*, holding that there must also be "rough proportionality" between the land use exacted by the government and the projected impacts on the proposed development. 512 U.S. at 391.

In *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013), the Supreme Court extended the *Nollan* and *Dolan* requirements to so-called "monetary exactions," finding the government's attempt to condition a development permit on the landowner's funding of offsite mitigation measures to be the functional equivalent of a typical land-use exaction. *Id.* at 612. Applying the *Nollan* and *Dolan* requirements, *Koontz* explained that "the government may choose whether and how a permit applicant is required

to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Id.* at 606.

Plaintiffs assert a monetary exaction claim under *Koontz*. *See* Doc. 22 ¶ 108. They allege that the District conditioned the Permit on a "monetary exaction from ABC" – the money ABC was required to spend on excavating and armoring the mining site. *Id.* ¶ 104. Plaintiffs further allege that this exaction of money "bear[s] no relation to the public interest of keeping a non-existent and completely theoretical flood, even a 100-year flood, at bay," and is not otherwise "proportionate to the District's stated goal of preventing a flood[.]" *Id.* ¶¶ 110-11; *see also id.* ¶¶ 42-44 ("None of [the Permit's] requirements held any reasonable nexus to ABC's mining and excavation. . . . Even if [the] requirements did have some nexus to ABC's mining and excavation, the proportionality of these requirements to mine for sand and gravel did not.").[2]

*Koontz* emphasized that not all conditions in land-use permits amount to unconstitutional conditions. Because many proposed land uses pose risks to the public that the government must mitigate, the government may condition a permit on mitigation measures so long as it is not "engaging in out-and-out extortion that would thwart the Fifth Amendment right to just compensation." 570 U.S. at 605-06 (cleaned up).

The first *Koontz* factor is whether there is an "essential nexus" between the conditions imposed by the Permit and a government interest that would furnish a valid ground for denial of the Permit. In this case, the District conditioned the 2017 Permit on construction of structures to stabilize the mining site and mitigate the risk of a 100-year flood. Docs. 22 ¶¶ 40-41, 44-14 at 4-6. No jury reasonably could find that measures designed to reduce the effects of a 100-year flood in a river-bed mining site have no essential nexus to the legitimate government interest of protecting against risks from major flood events.

---

[2] Because Plaintiffs allege only a monetary exaction taking, the Court need not address Defendants' argument that Plaintiffs have failed to establish a regulatory taking under *Penn Central*. Doc. 43 at 14-16; *see* Doc. 18 at 12-13 n.4; *Koontz*, 570 U.S. at 614.

7

1    Plaintiffs' taking claim is based on the fact that the District used the FEMA-
2 established flow rate of 39,000 cfs for the New River. Docs. 22 ¶ 66, 45 at 13, 21. But
3 Plaintiffs do not dispute that the District's regulation of floodplains must comport with
4 FEMA flow rates. *See* Docs. 44 ¶ 4, 45 at 16 (citing A.R.S. § 48-3609(M) ("The floodplain
5 regulations adopted by a district pursuant to this chapter are intended to carry out the
6 requirements of [FEMA's] national flood insurance program[.]")). Nor do Plaintiffs
7 dispute that the District applied the FEMA rate when it approved ABC's plan of
8 development and granted the 2017 Permit. *See* Doc. 45 at 13. Indeed, ABC's own engineer
9 has testified that he designed the development plan's excavation and armoring components
10 in compliance with the FEMA flow rate. Doc. 44-5 at 7. Given these undisputed facts, no
11 reasonable fact finder could conclude that the excavation and armoring requirements
12 imposed by the Permit bear no essential nexus to the District's duty to reduce flood hazards
13 using FEMA flow rates.

14    The second *Koontz* factor asks whether the excavation and armoring requirements
15 of the Permit – designed to mitigate the potential adverse impacts of a 100-year flood –
16 lack a rough proportionality to those impacts. Plaintiffs do not dispute that the Permit's
17 stabilization requirements are proportionate to a flood with a flow rate of 39,000 cfs. As
18 noted, the excavation and armoring plans were developed by ABC's own engineer based
19 on that flow rate. And Plaintiffs further acknowledge that the excavation and armoring
20 would still be required with the lower flow rate of 34,200 cfs found by the District's 2018
21 study. Doc. 45 at 9, 21; Doc. 46 ¶¶ 47-48.

22    In short, there is an essential nexus between the District's legitimate interest in
23 mitigating the risks of a 100-year flood and the Permit's stabilization requirements, *see*
24 *Nollan*, 483 U.S. at 837, and those requirements are proportionate both in nature and extent
25 to the impact of ABC's mining operations given the FEMA-established flow rate, *see*
26 *Dolan*, 512 U.S. at 391. Plaintiffs therefore cannot establish a *Koontz* taking claim at trial,
27 and the Court will grant summary judgment on count one.

8

There are additional reasons Plaintiffs' taking claim fails. The claim relies on Dillon's opinion that the New River's 100-year flow rate is no higher than 18,950 cfs. Docs. 22 ¶ 65, 45 at 10; *see* Doc. 46-42 at 11. But that opinion, even if valid, provides no basis for a constitutional taking claim because the District is required to apply FEMA flow rates in regulating floodplains. Plaintiffs claim is nothing more than a disagreement with the FEMA-established flow rate, and that does not produce a constitutional taking. *See Vill. Cmtys., LLC v. Cnty. of San Diego*, No. 20-CV-01896-AJB-DEB, 2022 WL 2392458, at *8 (S.D. Cal. July 1, 2022) ("Plaintiffs' contention that the County's fire risk concerns were not legitimate merely because the County's evacuation time analysis differed from that of Plaintiffs' and failed to consider Plaintiffs' alternative proposals to the easement condition do no more than present the type of 'run of the mill dispute between a developer and a town planning agency[.]'").

Plaintiffs note that the District is permitted to grant variances from the regulations (Doc. 45 at 16), but present no evidence that ABC requested a variance. *See* Doc. 51 at 9. To the contrary, ABC chose to comply with the District's requests for corrections and designed a plan of development that included excavation and armoring necessary for the 39,000 cfs flow rate. *See* Docs. 44-5 at 7, 47 ¶ 3. And even if ABC had requested a variance, they provide no persuasive reason to conclude that a local government's denial of a variance request gives rise to a Fifth Amendment taking.

Plaintiffs assert that the New River flow rate has not been updated since the 1980's because the District has relied on outdated data and has failed to submit new information to FEMA. Docs. 22 ¶¶ 58-66, 45 at 8, 13, 16-17. But Plaintiffs cite no legal authority suggesting that the District's reliance on outdated data, or its failure to provide information to FEMA, supports a constitutional taking claim.

Plaintiffs further assert that the District imposed the stabilization requirements to ensure that the Watercourse Master Plan could be implemented at a lower cost. Doc. 22 ¶¶ 57, 67; Doc. 45 at 17. But the deadline for creating the special district to implement the Watercourse Master Plan lapsed in July 2015, more than two years before the Permit was

issued in 2017. *See* Doc. 22 ¶¶ 32, 54; Doc. 43 at 3 n.2; A.R.S. § 48-6009(A).[3] Plaintiffs' claim that the Watercourse Master Plan was the reason for the stabilization requirements is simply not plausible.

**IV.     Due Process Claim (Count Two).**

Plaintiffs allege in count two that the Permit's stabilization requirements violate ABC's due process rights. Doc. 22 ¶¶ 118-23. Defendants argue that this claim, like the taking claim, asserts that the District required ABC to construct unnecessary structures to address a potential 100-year flood flow rate that the District purposefully kept higher than current conditions would dictate. Doc. 43 at 4.

The "irreducible minimum" of a "due process claim challenging land use action is failure to advance any legitimate governmental purpose." *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008); *see also Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994) ("The City's general plan does not violate substantive due process as long as it advances any legitimate public purpose, and if it is 'at least fairly debatable' that the decision to adopt the general plan and the water moratorium was rationally related to legitimate governmental interests, the City's actions must be upheld.") (citations omitted). Where a discrete permitting decision is at issue, as here, "only egregious official conduct can be said to be arbitrary in the constitutional sense: it must amount to an abuse of power lacking any reasonable justification in the service of a legitimate governmental objective." *Shanks*, 540 F.3d at 1088 (cleaned up). This is an "exceedingly high burden" that Plaintiffs cannot meet. *Id.*

Channel stabilization requirements designed to mitigate the risks of a 100-year flood clearly serve a legitimate governmental purpose, even if the FEMA-established flow rate is based on outdated data. *See Dolan*, 512 U.S. at 387 ("Undoubtedly, the prevention of flooding along Fanno Creek . . . qualif[ies] as the type of legitimate public purpose[] we have upheld."); *Unique Props., LLC v. Terrebonne Par. Consol. Gov't*, No. CIV.A.01-

---

[3] In early 2015, the Arizona Legislature considered but did not enact proposed H.B. 2559 which would have extended the deadline for formation of a new recreational corridor district to July 1, 2023. *See* Docs. 46 ¶ 19, 44-11 at 9, 46-20 at 2; State of Arizona, House of Representatives, https://www.azleg.gov/legtext/52leg/1r/bills/ hb2559h.pdf.

10

3503, 2004 WL 1278001, at *8 (E.D. La. June 8, 2004) ("[T]here can be little doubt that concerns about drainage and street flooding are related to the public interest in health, safety, and welfare."); *Gibb v. City of Friendswood*, No. CIV.A. G-07-329, 2007 WL 4326739, at *5 (S.D. Tex. Dec. 6, 2007) ("Although the Gibbs dispute whether a drainage plan was truly necessary for their particular property, they do not allege that the ordinances did not generally promote the goal of flood prevention or insurance rate reduction. As a matter of law, the ordinances bore a rational relationship to the City's legitimate goal of flood prevention."); *Terrace Knolls, Inc. v. Dalton, Dalton, Little & Newport, Inc.*, 571 F. Supp. 1086, 1092 (N.D. Ohio 1983) ("Silver Lake has a reasonable and legitimate interest in regulating development in land subject to flooding. Clearly the ordinance was a rational means to accomplish a purpose within the police and welfare powers. That the ordinance may have been enacted because incorrect facts were submitted to the officials does not transform it into a violation of substantive due process.").

The Court will grant summary judgment on count two. *See Grant v. City of Rio Rancho*, No. CV 03-0931 MV/RHS, 2005 WL 8163559, at *12 (D.N.M. Sept. 28, 2005) (granting summary judgment on due process claim where the plaintiffs failed to show that the challenged paving ordinance "does not bear a rational relationship to the City's interests in preventing flood damage on surface streets").

V. **Statute of Limitations.**

Plaintiffs' claims fail on the merits, for reasons stated above. Even if those claims were viable, however, they would be time barred.

The statute of limitations for claims brought under § 1983 in Arizona is two years from the date of accrual. *See* Doc. 18 at 3-6; A.R.S. § 12-542; *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 974 & n.5 (9th Cir. 2004). "[A] claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Soto v. Sweetman*, 882 F.3d 865, 870 (9th Cir. 2018) (citation omitted); *Two Rivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). This rule requires that a plaintiff "be diligent in discovering the crucial facts" of his claim. *Bibeau v. Pac. Nw. Rsch. Found, Inc.*, 188 F.3d 1105, 1108

(9th Cir. 1999). "[A] plaintiff who did not actually know that his rights were violated will be barred from bringing his claim after the running of the statute of limitations, if he should have known in the exercise of due diligence." *Id.*; *see* Docs. 43 at 16, 45 at 17.

Plaintiffs brought their § 1983 claims on November 4, 2021. Doc. 1. Thus, if Plaintiffs knew or had reason to know of the alleged constitutional violations prior to November 4, 2019, the claims are time barred under the two-year limitations period. *See* Doc. 43 at 16.

Plaintiffs assert that ABC had no reason to know that the District had used incorrect data in determining the flow rate until it received Dillon's report in March 2021. Doc. 45 at 18. The undisputed facts show otherwise.

On November 13, 2015, ABC responded to the District's request for corrections to the plan of development. Doc. 44 ¶ 16. ABC claimed that the District's use of the FEMA flow rate did not reflect current conditions in the floodplain and that the flow rate for a 100-year flood should be updated to 7,200 cfs. *Id.* ¶ 17; Doc. 44-4 at 6-7. ABC explained that streamflow gage readings on the New River after a large storm in September 2014 showed that the flow rate for a 500-year flood was only 5,568 cfs – well below the FEMA flow rate. *Id.*; *see* Docs. 22 ¶¶ 72-73, 46 ¶ 70. ABC explicitly stated that the District's failure to utilize this new data would result in an unconstitutional taking of ABC's property:

> In these circumstances, when recorded data shows that the District's 20-year-old hydrology inputs would result in unrealistic floodplain management regulations, it is both appropriate and consistent with state and federal law to revise those inputs so as to avoid imposing inappropriate restrictions on the applicant's use of his land. Failure to do so would result in a taking of A.B.C.'s property, in violation of its federal and state constitutional rights.

Doc. 44-4 at 7 (cleaned up).

Thus, as early as November 2015, ABC believed that any restrictions on its mining operations based on the outdated flow rate – such as the stabilization work required by the Permit – would result in an unconstitutional taking of its property. Plaintiffs clearly could have brought a taking claim when the work was performed. *See Knick v. Twp. of Scott,*

12

*Penn.*, 139 S. Ct. 2162, 2170 (2019) ("We have long recognized that property owners may bring Fifth Amendment claims . . . as soon as their property has been taken.").

ABC reiterated this position in a January 2017 letter to FEMA:

> Rather than exercising its eminent domain authority and paying just compensation to landowners affected by the creation of the Agua Fria recreation district, the District opted for what it called a regulatory "management approach to sand and gravel permits that confines erosion impacts of mining." In practice, this means that the District approves plans for sand and gravel developments only to the extent that the development is consistent with the Agua Fria Watercourse Master Plan and the District's vision of a recreation district along the Agua Fria River. This regulatory taking only works for the FEMA-approved hydrology currently in place for the Agua Fria – hydrology that is 30-years old and does not reflect current conditions. Put another way, the District uses outdated hydrology to effect a regulatory taking of private property.

Doc. 44-11 at 3 (cleaned up); *see also id.* at 8 ("The [District's] refusal to update the hydrology and its use of outdated hydrology is co-opting FEMA into a regulatory taking of private property.").[4]

ABC candidly admits that it has "believed for years" that the New River flow rate was less than 39,000 cfs, but claims that it did not learn the actual flow rate until it received Dillon's report in March 2021. Doc. 45 at 2-3, 9. But ABC had an obligation to "be diligent in discovering the crucial facts" once it was on notice of the possible taking claim, as it clearly was when it explicitly alleged a constitutional taking in 2015. *Bibeau*, 188 F.3d at 1108. ABC relied on flood data from 2014 to assert that the true 100-year flood flow rate was 7,200 cfs, well below the FEMA rate of 39,000 cfs. Docs. 22 ¶¶ 72-73; 44-4 at 6-7; 46 ¶ 70. If ABC felt that it needed more precision to be sure it had a claim, it could have hired Dillon or another hydrologist at that time and determined the actual flow rate using the very same streamflow data that it claims the District has ignored. *See* Doc. 22 ¶¶

---

[4] Plaintiffs assert that the letter focuses solely on the Agua Fria River, but the letter is much broader and addresses "the relevant area," including the New River. *See id.* at 3-4. Indeed, the letter specifically requests that "the New River flood insurance mapping be reopened because [the District] has not accurately represented the 100-year event on that River." *Id.* at 11.

58-61, 72-74; Doc. 44-4 at 7. Nothing prevented ABC from being diligent and discovering the actual flow rate as early as 2015. *See* Doc. 44-4 at 7. And yet ABC waited six years to bring this action. As noted above, a plaintiff is barred from bringing his claim after the running of the statute of limitations "if he should have known [of the claim] in the exercise of due diligence." *Bibeau*, 188 F.3d at 1108.

Plaintiffs asserted at oral argument that ABC acted reasonably in waiting for the District to conduct a new hydrology study in 2018. But ABC cites no authority suggesting that the obligation to act diligently in investigating one's potential claim is excused if you decide to let someone else to do the work. What is more, ABC has complained for years that the 39,000 cfs flow rate has not been updated since the 1980's because the District conducted no hydrology study and provided no new information to FEMA. Doc. 45 at 8. In its January 2017 letter to FEMA, ABC accused the District of "continually and intentionally ignor[ing] the regulated community's requests to conduct new hydrology studies[.]" Doc. 44-11 at 3. ABC further complained that any attempt to revise the flow rate "through a new hydrology study has been flatly rejected by [the District]." *Id.* at 6. Given these accusations and the ongoing heated litigation between ABC and the District, ABC's claimed reliance on the District to conduct a new study was not reasonable.[5]

Plaintiffs previously told the Court that based on the time limits contained in the 2017 Permit, the alleged unconstitutional taking occurred between November 2017 and August 2019. Doc. 16 at 5-6. Plaintiffs now assert that "the armoring is not complete" and "there is still more for ABC to install to mine to a depth of 60-feet." Doc. 55 at 2. But even with this change of position, Plaintiffs do not dispute that permit-required work began at the site in November 2017. By then, Plaintiffs were spending money on the stabilization requirements – the alleged injury about which they now complain – and, as shown by their repeated arguments made to the District and FEMA, believed the expenditures amounted

---

[5] Indeed, it seems clear that ABC never intended to accept any District study that found the excavation and armoring necessary. ABC hired one expert after receiving the District's study and, upon being dissatisfied with that expert's confirmation of the District's calculations, hired Dillon to opine that the flow rate was low enough to make the excavation and armoring unnecessary.

14

to a taking. Any taking claim based on excavation or armoring work done before November 4, 2019 is time barred. Plaintiffs' claim that the excavation and armoring requirements violate ABC's due process rights is also time barred because that claim accrued when the Permit issued on August 10, 2017, more than two years before Plaintiffs brought this action.

## VI.   Qualified Immunity.

The individual Defendants argue that qualified immunity bars the § 1983 claims. Doc. 43 at 17-18. The Court agrees.

Qualified immunity shields government officials from § 1983 claims unless the plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A government official's conduct violates clearly established law when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 741 (cleaned up). Although there need not be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & Cnty. of S.F., Calif. v. Sheehan*, 575 U.S. 600, 611 (2015) (cleaned up).

Plaintiffs claim that the individual Defendants took actions that "violate clearly established law, namely imposing regulations that constitute a taking[.]" Doc. 45 at 18-19. But the principle that government officials may not impose regulations that constitute a taking is simply too general to satisfy the "clearly established" requirement and defeat qualified immunity. The Supreme Court has repeatedly told courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Sharp v. Cnty. of Orange*, 871 F.3d 901, 910-11 (9th Cir. 2017) ("The Supreme Court has repeatedly instructed that we examine "whether the violative nature of *particular*

*conduct* is clearly established' by controlling precedent, not whether the conduct violates a general principle of law.") (citation omitted).

Plaintiffs claim that the individual Defendants relied on flow rate data they knew to be incorrect to ensure that the District would be able to implement the Watercourse Master Plan.  Docs. 22 ¶¶ 65-93, 45 at 19-22.  But Plaintiffs cite no case on similar facts where a court has upheld a taking or due process claim.  *See* Docs. 45 at 19-22, 51 at 11.  Thus, even if Defendants' use of the FEMA flow rate results in a constitutional violation (which it does not for reasons stated above), the individual Defendants are entitled to qualified immunity.  The Court will grant summary judgment on this point as well.

**IT IS ORDERED:**

1. Defendants' motion for summary judgment (Doc. 43) is **granted**.[6]

2. The Clerk of Court shall enter judgment in favor of Defendants and terminate this action.

Dated this 24th day of August, 2023.

David G. Campbell
Senior United States District Judge

---

[6] Given this ruling the Court need not address Defendants' argument that the § 1983 claims are barred by claim preclusion.  *See* Doc. 43 at 18-19.